UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Larry Gehl,<br><br>            Plaintiff,<br><br>v.<br><br>James P. Gleason,<br><br>            Defendant. | Case No. 23-cv-02244-DWF-JFD<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

This is a straight-forward breach of contract case that is ripe for summary judgment. Plaintiff Larry Gehl ("Gehl) loaned $2.12 million dollars to Xtraction, Inc. ("Xtraction"). As security for the loan, Defendant James Gleason ("Gleason") entered into (1) a personal guaranty in which he unconditionally guaranteed repayment of seventeen and one-half percent (17.5%) of the loan amount, and (2) a pledge agreement in which he pledged his equity in Xtraction as collateral for the loan and his guaranty. When Xtraction defaulted on the loan, Gleason failed to pay any funds to Gehl. Gleason similarly failed to transfer his equity in Xtraction to Gehl.

Gleason does not dispute the above facts. Instead, he attempts to muddy the waters and direct the Court to other legal proceedings and issues pending before a California court. Such distractions fail because the material facts of the matter cannot reasonably be disputed: Gleason has breached the personal guaranty and pledge agreement.

Gehl is entitled to summary judgment on his breach of contract claim, and he is entitled to a judgment in the amount of 17.5% of the outstanding amount of the Note plus accrued interest on that part of the principal and collection costs, including reasonable attorney's fees.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*The Parties*

On October 1, 2018, Gehl and Gleason—along with non-parties Mike Gurnee and Gabriel Villalobos—founded Xtraction, Inc. ("Xtraction"), a mattress recycling company. [Declaration of Larry Gehl ("Gehl Decl.") at ¶ 2.] As of June 17, 2019, the ownership percentage interests were as follows:

| | |
|---|---|
| Robert Gurney………….  | 42.5% |
| Larry Gehl……………… | 35.0% |
| Jim Gleason……………. | 17.5% |
| Gabriel Villalobos……… | 5.0% |

[Declaration of Charles Maier ("Maier Decl."), Ex. 1.]

Gehl's ownership reflected his cash investments to Xtraction. *Id*. Gehl was the only partner who invested funds into the company. [Maier Decl., Ex. 2 at 49:12–16.]

*Xtraction's Purchase of RIP Assets*

In 2020, Xtraction sought to purchase the assets of another mattress recycling company, Rest In Peace Recycling, LLC ("RIP"). [Gehl Decl. at ¶ 3.] In order to secure

---

[1] Gehl will voluntarily dismiss his promissory estoppel claim and replevin claim should the Court grant summary judgment on his breach of contract claim. Discovery has disclosed that no stock certificate was issued for Gleason's Xtraction shares and thus no replevin order is needed.

2

financing for this purchase, Xtraction borrowed $2,120,200.00 from Gehl (the "Loan"). [Gehl Decl. at ¶ 3; Maier Decl., Ex. 2 at 60:19–61:6.]

*The Loan Documents*

On December 1, 2020, Xtraction executed and delivered to Gehl a promissory note (the "Note") in the original principal amount of $2,120,200,00. [Maier Decl., Ex. 3.] The Note expressly requires on its first page that:

> The indebtedness evidenced by this Note is secured by the personal guarantees and pledge agreements of Robert M. Gurnee and James P. Gleason.

[*Id.* at p. 1.]

On January 11, 2021, Gleason executed and delivered to Gehl a Personal Guaranty (the "Guaranty") assuring the punctual and complete payment and performance of all obligations by Xtraction pursuant to the Note. [Maier Decl., Ex. 2 at 82:4–10; Ex. 4.] The Guaranty provides that in the event Xtraction does not repay Gehl, Gleason's maximum personal liability is "seventeen and ½ percent (17.5%) of the outstanding balance of the principal under the Note at the time Lender seeks to enforce this Guaranty, plus all accrued interest under the Note and any costs of collections including attorneys' fees to enforce this Guaranty or the Note." [Maier Decl., Ex. 4 at ¶ 2.]

The Guaranty also provides that Gleason's obligation is absolute and as such, he waives all defenses associated with non-payment:

> [Gleason's] liability for payment of the Note shall be absolute and unconditional, and nothing except final and full payment to the Lender of the Note shall operate to discharge [Gleason's] liability under this Guaranty. Accordingly, [Gleason] unconditionally and irrevocably waives each and every defense that under principles of guaranty and suretyship law would

3

> otherwise operate to impair or diminish the liability of [Gleason] for the Note, including but not limited to diligence, promptness, presentment, demand, protest, notice of acceleration, notice of intent to accelerate, notice of default, notice of dishonor, notice of protest, notice of execution, notice of extension, notice of renewal, amendment or modification of the Note or Security Agreement, notice of acceptance of this Guaranty, and notice of the creation of the Note. [Gleason] agrees to pay any and all expenses and costs of collections (including attorney fees) incurred by Lender in enforcing any rights under this Guaranty.

[*Id.* at ¶ 4.] Gleason agreed that he signed this document freely and voluntarily, without duress or coercion. [*Id.* at ¶ 11.]

Also on January 11, 2021, Gleason executed a pledge agreement (the "Pledge Agreement"), as required by the Note. [Maier Decl., Ex. 2 at 94:4–96:22; Ex. 5.] Under the Pledge Agreement, Gleason pledged his 17.5% ownership interest in Xtraction—consisting of 1,750 shares (the Collateral")—as security to Gehl for the payment and performance of all obligations by Xtraction under the Note. [Maier Decl., Ex. 5. at ¶ 1.] Gleason understood this obligation:

> **Q.** (By Mr. Maier, continuing) Did you understand, generally, that you were pledging, as security for the guaranty, your stock in Xtraction?
>
> **A.** Yes. That was the whole point.

[Maier Decl., Ex. 2 at 101:7–11.]

Pursuant to the Pledge Agreement, Gleason is in default if Xtraction fails to pay the Loan amount to Gehl. [Maier Decl., Ex. 5 at ¶ 5(c).] In the event of a default, Gleason agreed that Gehl may declare any or all unmatured debt to be immediately due and payable without presentment. [*Id.* at ¶ 6(a)(i).] The Pledge Agreement contains an integration clause, whereby it agrees to supersede all prior understandings. [*Id.* at ¶ 11(i).]

Gleason agreed that it was his own decision to enter into the Pledge Agreement and he did so independently. [*Id.* at ¶ 4(f).] It was his intent to abide by the terms of both the Pledge Agreement and the Guaranty:

> **Q.** At the time you signed Exhibits 2 and 3 that we've talked about, the guaranty and the pledge agreement, was it your intent to stand behind those promises if Xtraction was not able to pay the note?
>
> **A.** The fact that the – the 17.5 percent that I had put up there – that was – that was the backstop. My – my philosophy on – was that I am putting my abilities and reputation up to do this.
>
> I am going to achieve it or else I'm going to lose everything I put into this company.
>
> That was – what was the – that was the bargain that I was making. And agreeing on another three years away from the company that I had founded, that I was half partners with.

[Maier Decl., Ex. 2 at 102:2 – 17.]

### *Gehl Performs His Obligations*

On December 1, 2020, Gehl wired $1,827,975 to RIP. [Declaration of Scott Dunlop ("Dunlop Decl.") at ¶¶ 5–6; Dunlop Decl., Exs. A–B.] On April 28, 2021, Gehl wired the remaining $300,000 to RIP. [Dunlop Decl. at ¶¶ 8–9; Dunlop Decl., Ex. C.]

### *Xtraction Fails to Repay the Loan*

Despite Gehl providing the funds to RIP, Xtraction did not repay the Loan amount to Gehl. [Gehl Decl. at ¶ 12.] On July 15, 2021, Gehl sent a letter to Xtraction triggering the repayment obligation of the Note. [Maier Decl., Ex. 8.] Xtraction did not pay Gehl any funds in connection with the Note. [Gehl Decl. at ¶ 14.] On July 19, 2023, Gehl sent Xtraction a demand for repayment. [Maier Decl., Ex. 9.] Xtraction still did not repay the Loan amount. [Gehl Decl. at ¶ 14.]

*Gehl Seeks Payment From Gleason*

By the time Gehl sought repayment of the Loan amount from Xtraction, Gleason's employment with Xtraction had ended. [*See generally,* Maier Decl., Ex. 2 at 110:15–16.] Gleason did not surrender his equity in Xtraction, as required by Pledge Agreement. [Gehl Decl. at ¶ 16.] Gleason similarly did not honor his obligations in the Guaranty, which included paying Gehl the principal amount of $371,000[2] and the interest amount of $78,950.15, for a total due and owing of $449,950.15.[3] [*Id.* at ¶ 15.]

## STATEMENT OF THE ISSUES

I.  Did Gleason breach the Personal Guaranty?

II.  Did Gleason breach the Pledge Agreement?

III.  Has Gleason asserted any viable defenses?

IV.  Is Gehl entitled to seek recovery of attorneys' fees and costs?

## LEGAL STANDARDS

**I.  Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view the evidence and the inferences that may be

---

[2] 17.5% of the $2,120,200 Loan amount.
[3] This figure is as of the date of the Complaint, and will continue to accrue interest at the rate of eight percent (8%) per annum with a per diem of $83.32 until judgment is entered and then continuing interest at the statutory rate until judgment is satisfied. [*See* Maier Decl., Ex. 3 at p. 1; Maier Decl. at ¶ 12.] This figure does not include Gehl's attorneys' fees and costs that Gehl is entitled to under the Guaranty and Pledge Agreement. [*See* Maier Decl., Exs. 4–5.]  If this motion is granted, Gehl plans to seek recovery of his costs, including reasonable attorney's fees by motion or as otherwise required by the Court.

6

reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). As the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## **ARGUMENT**

On January 11, 2021, Gleason signed both a Personal Guaranty and Pledge Agreement. [Maier Decl., Exs. 4, 5.] Instruments executed simultaneously, by the same parties, relating to the same transaction are considered and construed together because "they are, in the eyes of the law, one contract or instrument." *Farrell v. Johnson*, 442 N.W.2d 805, 806 (Minn. Ct. App. 1989) (citations omitted). These contracts, construed together, set forth Gleason's obligations pertaining to the Note—obligations that he has failed to abide by. Thus, Gleason has breached both contracts.

## I.     Gleason Breached the Personal Guaranty.

Pursuant to the Personal Guaranty, Gleason is required to pay 17.5% of the Loan amount, plus interests and attorneys' fees, if Xtraction defaults on the Note. [Maier Decl., Ex. 4 at ¶ 2.] Xtraction did not repay the Loan amount to Gehl, thus defaulting on the Note. [Gehl Decl. at ¶ 12.] Gleason has failed to pay Gehl 17.5% of the Loan amount, plus interests and attorneys' fees, thus breaching the Personal Guaranty. [*See id.* at ¶ 13.]

Under Minnesota law, guaranties are effectively unilateral contracts. *See U.S. Bank Nat. Ass'n v. Polyphase Elec. Co.,* 2012 WL 1394397 (D. Minn. Apr. 23, 2012).

> The act of extending the credit, standing alone, without notice to the guarantor, is sufficient acceptance of his undertaking. That is so because the offer does not require such notice or anything other than or additional to the act of the creditor in extending credit to the principal debtor as a binding acceptance.

*Id*. (citing Midland Nat'l Bank of Minneapolis v. Sec. Elevator Co., 200 N.W. 851, 853–55 (Minn. 1924)).

A creditor need not provide notice of acceptance to a guarantor when "the terms of a guaranty unequivocally anticipate the extension of credit to a third person, and the guarantor can reasonably anticipate that the guarantee will act in reliance thereon ... in order to make the contract effective." *Southdale Ctr., Inc. v. Lewis*, 110 N.W.2d 857, 863 (Minn. 1961). "The party seeking to enforce a writing need not have signed the document if he agreed to and has acted in conformity with the contract." *Poser v. Abel*, 510 N.W.2d 224, 228 (Minn. Ct. App. 1994) (citing *Taylor v. More*, 263 N.W. 537, 539 (Minn.1935)); *see also Taylor Inv. Corp. v. Weil*, 169 F.Supp.2d 1046, 1056 (D. Minn. 2001) (holding

that, because defendant acted in conformity with agreement by accepting licensing fee and providing plaintiff with software product, defendant need not have signed the agreement).

When the terms of a personal guaranty are clear and unambiguous, they will be enforced. *Constr. Mortg. Invs. Co. v. Farr*, 2010 WL 3119443 (Minn. Ct. App. Aug. 10, 2010). In fact, even if a party signs a personal guaranty without reading it, the terms will still be enforced. *See id.* at *4 (citing *Huseman v. Life Ins. Co. of N. Am.*, 402 N.W.2d 618, 620 (Minn. Ct. App. 1987) (holding that a party signing a contract is bound by its terms whether the party read the contract or not, unless there is fraud, mistake, or unconscionable terms)).

Here, the Personal Guaranty is clear and unambiguous. The Personal Guaranty states Gehl entered into a promissory note with Xtraction for $2,120,000, and that Gleason personally guaranteed 17.5% of that amount. [Maier Decl., Ex. 4 at p. 1.] Gleason himself admits that he understood he was responsible for ensuring the repayment of the Note:

> **Q.** Were you aware, in – the end of 2020 or beginning of 2021, that you were being asked to, and you did, in fact, sign a personal guaranty related to Exhibit 1, the promissory note?
>
> **A.** That was the idea. And con- – contextually, that was a function of Mr. Gehl expressing his very vehement commentary that money that was going to be paid out for this – this loan – he wanted to have the assurance that Mr. Gurnee and myself would remain there **to ensure the management of the company and subsequent repayment of the loan.**
>
> That was – that was, essentially, the commitment that I made to Mr. Gehl.

(Emphasis added.) [Maier Decl., Ex. B at 80:2–15.]

9

Gehl was not required to sign the Personal Guaranty, and he was not required to notify Gleason that he accepted the terms of the Personal Guaranty. *Poser,* 510 N.W.2d 228; *Southdale Ctr.,* 110 N.W.2d 863. Gleason signed the Personal Guaranty, thus binding him to its terms. *Farr,* 2010 WL 3119443 at *4.

Gleason became liable for 17.5% of the Loan amount, plus interests and fees, when Xtraction defaulted on the Note. [Maier Decl., Ex. 4 at ¶ 2.] Yet Gleason has failed to pay any funds to Gehl in connection with the Personal Guaranty. [Gehl Decl. at ¶ 13.] Gleason acknowledges that he has failed to fulfil his obligations:

> **Q.** I – I guess I want to get back to Exhibit 2 [the Guaranty], instead of talking, maybe, about hypotheticals. Do you – is it your position that you do not have to live up to your responsibilities that are set forth in Exhibit 2?
>
> **A.** **It is my position that I was not able to live up to this** because I was unjustly terminated from that company.[4]

(Emphasis added.) [Maier Decl., Ex. 2 at 90:19–24.]

While Gleason attempts to conflate his employment separation in July 2021 with his promises made six months earlier in the Guaranty and Pledge, there simply are no material facts related to July 2021 events that would excuse Gleason's obligations under the unambiguous contracts made in January 2021. Based on these undisputed facts, Gehl is entitled to summary judgment on his breach of contract claim against Gleason.

---

[4] As set forth in Section III, Gleason's purported excuses for non-performance fail.

## II.     Gleason Breached the Pledge Agreement.

The Pledge Agreement further supports Gehl's obligation to pay Gehl 17.5% of the Loan amount.

Pursuant to the Pledge Agreement, Gleason is in default if Xtraction fails to pay the Loan amount from the Note. [Maier Decl., Ex. 5 at ¶ 5(b),(c).] The remedies for default include allowing Gehl to (1) declare any and all unmatured debt to be immediately due and payable without presentment or any other notice or demand and immediately enforce payment of any or all of the debt, and (2) exercise any enforce any other rights or remedies available to Gehl by law. [*Id.* at ¶ 6(a)(i),(iv).] Under Minnesota law, a secured party may seek judgment from the court after a default. Minn. Stat. § 336.9-601(1).

A security interest is "an interest in personal property ... which secures payment or performance of an obligation." Minn. Stat. § 336.1–201(b)(35). A security interest is enforceable if (1) "value has been given"; (2) "the debtor has rights in the collateral"; and (3) "the debtor has authenticated a security agreement that provides a description of the collateral." *Id*. § 336.9–203(b).

In evaluating whether an enforceable security interest was created, the Court looks to the intent of the parties. *Vacura v. Haar's Equip., Inc.*, 364 N.W.2d 387, 392 (Minn. 1985). The relevant inquiry, however, is whether the parties objectively intended to create a security interest, rather than the parties' "subjective intent." *Id*.

Here, the Pledge Agreement is an enforceable security interest. Value has certainly been given by both Gehl and Gleason. Gehl provided the necessary funds to purchase RIP, and Gleason provided his equity in Xtraction as collateral. [Gehl Decl. at ¶ 11; Maier Decl.,

11

Ex. 5.] It is undisputed that Gleason had rights to his equity in Xtraction. [Maier Decl., Ex. 1.] Finally, Gleason signed the Pledge Agreement, which contains the following description of the collateral:

> [Gleason] owns a 17.5% ownership interest consisting of 1,750 shares ("Equity") in Xtraction, Inc., a California corporation ("Company") whose address is 11258 Monarch Street, Suite k, Garden Grove, CA 92841.
>
> […]
>
> As security for the prompt and unconditional payment of all amounts due under any and all obligations and liabilities of every type and nature (whether direct or indirect, due or to become due, absolute or contingent, and whether the same would become due but for the operation of the automatic stay under bankruptcy laws) that Company may now or hereafter owe to [Gehl] arising out of the Note, Loan Documents or the Guaranty (collectively, the "Debt"), [Gleason] pledges and grants to [Gehl] a continuing security interest in the Equity (including all financial and voting rights) and, in the event of a default (as defined in the Note) all dividends, distributions, cash, proceeds, substitutions, instruments, and other property received, receivable, or otherwise distributed in respect of or in exchange for all or any of the Equity (all of the foregoing being referred to as "Collateral").

[Maier Decl., Ex. 5.]

Gleason objectively and subjectively understood he was pledging his stock as security:

> **Q.** (By Mr. Maier, continuing) Did you understand, generally, that you were pledging, as security for the guaranty, your stock in Xtraction?
>
> **A.** Yes. That was the whole point.

[Maier Decl., Ex. 2 at 101:7–11.] Thus, the Pledge Agreement is a valid security interest.

The Note is in default. [Gehl Decl. at ¶ 12.] Accordingly, Gehl is entitled to declare any and all unmatured debt to be immediately due and payable without presentment or any other notice or demand and immediately enforce payment of any or all of the debt. [Maier

Decl., Ex. 5 at ¶ 6(a)(i).] Because Gleason has failed to pay any funds to Gehl, Gleason is in breach of the Pledge Agreement. [Gehl Decl. at ¶ 16.]

As such, Gehl requests that this Court award him a money judgment as a matter of law.

### III. Gleason Has Not Asserted Any Viable Defenses.

While Gleason attempts to justify his breaches, none of his purported justifications excuse him from his obligation to pay Gehl.

#### A. Failure to State a Claim

Gleason alleges that Gehl has failed to state a claim upon which relief may be granted. [Maier Decl., Ex. 6 at p. 6.] As demonstrated above, Gehl has more than established his claim for breach of contract.

#### B. Personal Jurisdiction

Gleason alleges that the Court does not have personal jurisdiction over him. [*Id.*] To preserve a personal jurisdiction argument after asserting it in an answer, the asserting-party is required to act promptly in order for the jurisdictional issue be timely decided. *Fed.-Hoffman, Inc. v. Fackler*, 549 N.W.2d 93, 95 (Minn. Ct. App. 1996). When a party fails to take action on a personal jurisdiction defense for three months after assertion, the defense is waived. *Id.* Here, it has been more than a year since Gleason alleged a lack of personal jurisdiction. He has taken no action on this defense and has thus waived it.

### C. Inappropriate Venue and Forum

Gleason alleges that this Court is not the correct venue or forum for Gehl's claims. [*Id.*] However, the Court already ruled in its April 9, 2024 Order that venue is proper and it is the right forum for the claims. [Maier Decl., Ex. 7.] Thus, these defenses are not viable.

### D. Lack of Jurisdiction

Gleason also attempts to claim this Court does not have jurisdiction over his collateral – his shares in Xtraction. [Maier Decl., Ex. 6 at p. 6.] The Court need not consider the application of this defense, as Gehl is not seeking an order regarding the collateral. Gehl is seeking a monetary judgment in the amount of $484,836.43.[5] [Maier Decl., Ex. 6 at p. 6.] Thus, any defense related to jurisdiction over the collateral is immaterial.

### E. Equitable Claims

Gleason states that Gehl's claims are barred by various equitable doctrines, including laches, unclean hands, promissory and/or equitable estoppel. The record is devoid of material facts to support such defenses and in any event, they fail in the face of the unambiguous contracts. Moreover, many of the equitable defenses are simply not available in a breach of contract action. *See Moore v. Medtronic, Inc.*, 2001 WL 1636248 at *3 (D. Minn. July 30, 2001). Thus, such equitable claims fail.

### F. Right of Offset

Gleason claims he is entitled to an offset of any amount owing to him by Plaintiff. [*Id.*] However, this defense is explicitly waived in Guaranty. [Maier Decl., Ex. 4 at ¶ 8

---

[5] This figure is of October 1, 2024 and does not yet include attorneys' fees . [Maier Decl. at ¶ 12.]

14

("Guarantor unconditionally and irrevocably waives * * * any set-offs or counterclaims against Lender which would impair or affect the Lender's rights against Guarantor * * *."] Thus, this defense is unavailable to Gleason.

G.  **Statute of Limitations**

Gleason alleges that Gehl's claims are barred by the statute of limitations. [Maier Decl., Ex. 6 at p. 6.] As it relates to the Guaranty, Gleason waived all defenses related to the statute of limitations in paragraph nine. [Maier Decl. Ex. 4 at ¶ 9.] The statute of limitations for a breach of contract claim is six years. *See* Minn. Stat. § 541.05, subd. 1(1). The Pledge Agreement and Guaranty were executed less than six years ago. [Maier Decl., Exs. 4, 5.] Gleasons breaches of these agreements cannot be barred by the statute of limitations. As such, this affirmative defense fails.

H.  **Waiver**

Finally, Gleason claims that Gehl may have waived his claims. [Maier Decl., Ex. 6 at p. 6.] Both the Guaranty in paragraph 9, and the Pledge in paragraph 11(l) expressly remove waiver as a viable defense. [Maier Decl. Ex. 4 at ¶ 9; Ex. 5 at ¶ 11(l).] Gleason has provided no evidence or justification for this defense and thus, Gleason has failed to adequately establish it as a defense.

None of Gleason's identified "affirmative defenses" are viable. Accordingly, he is liable for his breaches of contract.

IV.  **Gehl is Entitled to Seek Recovery of Attorneys' Fees and Costs**

Under Minnesota law, attorneys' fees are recoverable if, as in this case, they are specifically authorized by contract. *Van Vickle v. C. W. Scheurer & Sons, Inc.*, 556 N.W.2d

238, 242 (Minn. Ct. App. 1996) (citing *Barr/Nelson, Inc. v. Tonto's, Inc.,* 336 N.W.2d 46, 53 (Minn. 1983)). The Personal Guaranty and the Pledge Agreement both state that Gleason is required to pay all costs of collection including attorneys' fees and costs that Gehl incurs in the course of enforcing the Loan Documents. [Maier Decl., Ex. 4 at ¶ 4; Ex. 5 at ¶ 9.] Courts routinely enforce contractual attorneys' fees provisions. *See Novus Franchising, Inc. v. AZ Glassworks, LLC*, No. CIV. 12-1771 MJD/TNL, 2013 WL 1110838, at *9 (D. Minn. Mar. 18, 2013); *Days Inn Worldwide*, 2010 WL 3546958, at *6. This Court should determine that Gehl is entitled to recover of his attorneys' fees and costs associated with his efforts to enforce the Personal Guaranty and the Pledge Agreement.[6]

## **CONCLUSION**

Simply put, Gleason has failed to abide by the terms of the Personal Guaranty, and he has failed to transfer his equity in Xtraction to Gehl, pursuant to the Pledge Agreement. As a result, Gehl is entitled to judgment in the amount of $484,836.43[7] as a matter law.

---

[6] Gehl will seek an award of his fees and costs incurred including attorneys' fees by motion after the granting of judgment by motion or as otherwise required by the Court.
[7] *See supra* note 5.

Dated: October 1, 2024                        **LATHROP GPM LLP**

By: _/s/ Charles K. Maier_
    Charles K. Maier (#230315)
    Kiralyn J. Locke (#403653)
    3100 IDS Center
    80 South 8th Street
    Minneapolis, MN 55402
    Charles.maier@lathropgpm.com
    Kiralyn.locke@lathropgpm.com

***Attorneys for Plaintiff***