| | |
|---|---|
| Larry Gehl, | Case No. 23-CV-02244-DWF-JFD |
| Plaintiff, | **DEFENDANT'S OPPOSITION TO** |
| | **PLAINTIFF'S MOTION FOR** |
| v. | **SUMMARY JUDGMENT** |
| James P. Gleason, | |
| Defendant. | |

## <u>INTRODUCTION</u>

Defendant James P. Gleason ("Gleason") submits this Opposition to the Motion for Summary Judgment ("Motion") filed by Plaintiff Larry Gehl ("Gehl").[1] The Motion is a premature and unmerited effort to gain judgment while material disputes between the parties await decision – both here and in the related action pending in California. Indeed, should Gleason prevail on one or more of the Claims in the California action, that success will undercut Gehl's claims to enforce the guaranty, or create on offset in Gleason's favor. Accordingly, to the extent the Court chooses to grant the Motion, judgment should be stayed pending final resolution of the California action.

While the Motion suggests this is a run-of-the-mill breach of guaranty action, the underlying facts demonstrate a far more complex story, showing Gehl's ill-conceived,

---

[1] In fact, Gehl seeks partial summary judgment, as the Motion is limited to Count I in his Complaint for breach of a personal guaranty. [ECF 1, Complaint, pp. 4-5.]

orchestrated attempts to use the guaranty, which was only obtained through Gehl's many misrepresentations to Gleason, as leverage against him.

Gehl and Gleason are former business partners in Xtraction, Inc. ("Xtraction"), a California-based mattress-recycling company. Just over six months after the company was formed in 2018, they and their business partners (Michael R. Gurnee ("Gurnee") and Gehl's right-hand man, Scott Dunlop ("Dunlop")) began extensive efforts to expand the technologies and processes that Xtraction had developed to the East Coast. These efforts were central to the organization and given Gehl, Gurnee, and Gleason's full attention.

In furtherance of these strategies, Gehl pushed to acquire a competing recycling company. More than one month after that transaction, Gehl demanded that Gleason personally guaranty Gehl's purchase of that company, together with a pledge of Gleason's shares in Xtraction.[2] At the same time of the purchase transaction, Gehl also required that Xtraction amend its bylaws to mandate that a shareholder sell his stock back to the company upon his termination of being a company officer.

The Motion ignores the broader context of the relationship and the claims in the pending California action, and for understandable reasons. As the evidence shows, at the same time Gehl and Gurnee were actively pursuing an East Coast expansion with Gleason, and Xtraction was supposedly acquiring assets that would facilitate those efforts, Gehl and Gurnee were surreptitiously implementing the expansion plans without Gleason. In other words, Gehl flatly misrepresented his true intentions to connive Gleason to sign a guaranty,

---

[2]    Notably, Gehl did not seek any additional security from Gleason for the guaranty.

when Gehl already knew—and, indeed, was implementing his own plans—to extricate Gleason from the company and take back Gleason's shares, only to hold the guaranty over Gleason's head later (i.e., now) as a bargaining chip. Gehl's actions are particularly egregious when considering his singular focus on Gleason, while not pursuing either Xtraction ("Why am I going to sue a company that's mine?") or Gurnee.

As explained below, this and other evidence precludes summary judgment, as several triable issue of material fact exist. Preliminarily, the Motion fails to provide admissible evidence or support that Gehl can enforce the underlying note (a pre-condition to enforcing the guaranty) having failed to comply with its express terms before pursuing Gleason here, or the guaranty (or pledge agreement). Indeed, when considering Gehl's control over Xtraction, the note is purely illusory. Separately, considering evidence demonstrating Gehl's orchestrated misdeeds to procure a guaranty, the law bars its enforcement based on lack of consideration, and estoppel and related grounds. Such issues should be resolved by trial, not on summary judgment.

## FACTUAL BACKGROUND

### A. Gleason and Robert M. Gurnee Conceive Xtraction, which Gehl Joins

Beginning in July 2018, Gleason and Gurnee formed a partnership to operate businesses relating to industrial shredding and separation technologies. The two had conceived how to apply existing technologies for the recycling of old mattresses. [Dec. of James P. Gleason ("Gleason Decl. "), ¶¶ 2-5.] The first company they formed was Xtraction. [Gleason Decl. ¶ 6.]

Gehl was also one of Xtraction's owners. [Gleason Decl. ¶ 7.] Gehl insisted that his attorneys prepare Xtraction's formation documents, including its bylaws. These documents followed the "standards" Gehl had used in purchases of other companies. [Gleason Decl. ¶ 8 & Exs. 1, 2; *see also* Decl. of Jack R. Scharringhausen ("Scharringhausen Decl."), Ex. 2 [Gehl Depo Tr.] at 48:19-49:3, 50:9-51:1-15.] Gehl also required that his longtime employee, Dunlop, with Gleason and Gurnee, be made an officer of Xtraction.

Thereafter, until his involuntary termination in July 2021, Gleason served as Xtraction's Chief Operating Officer and sat on Xtraction's Board of Directors. [Gleason Decl. ¶¶ 9-10 & Ex. 3.]

**B.** **Gehl, Gurnee, and Gleason Start to Realize and Implement Their Plans to Expand Xtraction's Operations and Processes to the East Coast**

It had always been Gehl, Gurnee, and Gleason's goal to expand Xtraction's services and technologies from its California base to other states. [Gleason Decl. ¶¶ 6, 13.] By summer, 2020, this dream started being realized. Xtraction's sole client, Mattress Recycling Council ("MRC"), had contracts with states and municipalities for recycling and disposing of mattresses. [Gleason Decl. ¶ 12.] MRC had been soliciting Xtraction to service its contracts in Rhode Island and Connecticut. [Gleason Decl. ¶¶ 13, 15.]

Excited with the prospect of taking Xtraction's technologies elsewhere, in April 2020, Gehl, Gleason, and Gurnee began to formulate the steps to expand Xtraction's processes and take advantage of the opportunity MRC presented. These efforts included numerous in-person and telephonic meetings; meetings with MRC's Director, Mike

O'Donnell; and email communications, all with an eye on an East Coast expansion. [*See* Gleason Decl. ¶¶ 14-26 & Exs. 4-9].

Although Gehl stated during his deposition that expanding Xtraction's mattress recycling services to other parties of the country were never discussed,[3] he was directly and integrally involved throughout. In addition to telephone conversations (*see, e.g., Gleason Decl.,* ¶ 15), Gehl actively participated in these efforts, including:

- A June 25, 2020, site visit to SSI Shredding Systems ("SSI"), located in Wilsonville, Oregon, to evaluate a new machine for mattress shredding that SSI had manufactured. Leading up to that visit, Gleason, Gurnee, and Gleason discussed the expansion strategy in preparation for meeting with O'Donnell, who would also be present for the visit. [Gleason Decl. ¶¶ 16-18 & Ex. 4 (Gurnee emphasizing MRC's interest in contracting with Xtraction for Connecticut and Rhode Island)];

- A July 6, 2020, email *from Gehl* informing Gleason that he (Gehl) and Gurnee had discussed potentially forming a new limited liability company for Xtraction's East Coast expansion, asking Gleason for his thoughts on the idea [Gleason Decl. ¶¶ 19, 20 & Ex. 6];

- July 6, 2020, emails between Gehl and Gurnee discussing the importance of securing a significant part of the Massachusetts mattress-recycling business, with Gehl providing drawings for a new machine [Gleason Decl. ¶¶ 21, 22 & Ex. 7];

- A July 3, 2020, email regarding Gehl's proposal to potentially expand to Minnesota [Gleason Decl. ¶¶ 23, 24 & Ex. 8]; and

---

[3] When asked whether, as of December 2020, Xtraction had plans to expand to other clients or service other states, Gehl answered, "No." When next asked whether he, Gurnee, and Gleason had such plans, Gehl answered, "No, not to my knowledge." [Scharringhausen Decl., Ex. 2 at 85:25-86-12.] As demonstrated by the emails attached as Exhibits 4-9 to Gleason's Declaration, this was untrue. Of note, Gehl did not even produce these emails in discovery in this action. [Scharringhausen Decl. at ¶ 3.]

- An August 16, 2020, email from Gurnee detailing his conversations "with players in the North East" and impending call with MRC, in furtherance of the expansion strategy [Gleason Decl. ¶ 25 & Ex. 9].[4]

Thus, despite deposition testimony that no discussions regarding East Coast expansion of Xtraction's processes occurred, Gehl was directly involved in advancing those plans.

## C.    Gehl Pushes for Xtraction to Purchase a Competing Recycling Company

Starting in or about summer of 2020, at the time developments were underway to expand Xtraction, Gehl, Gurnee, and Gleason were entertaining the possibility of Xtraction acquiring Rest In Peace Recycling LLC ("RIP"), a California-based recycling company owned by Matthew Young ("Young"). Gehl dominated these negotiations. [Scharringhausen Decl., Ex. 2 at 89:17-91:17; Gleason Decl. ¶ 29.]

According to the Complaint, on December 1, 2020, Xtraction signed a Promissory Note (the "Note") in the sum of $2,120,000.00 payable to Gehl. This Note, signed by Gehl and Gurnee, purportedly was related to Xtraction's purchase of RIP's assets, although the Note does not state this.[5] [Complaint, ECF 1, at ¶ 7 & Ex. A.] While the transaction purports to result in Xtraction's purchase of RIP's assets, at no time did Xtraction receive a loan from Gehl for the acquisition of RIP (such as a deposit into Xtraction's bank account), nor were any shares of RIP deposited with Xtraction. Further, during Gleason's

---

[4]    During this same time, Gehl had approached Gleason about "getting rid" of Gurnee, as, per Gehl, Gurnee "really didn't do much of anything." Gleason could and would not agree to remove Gurnee from Xtraction. [Gleason Decl. ¶¶ 27, 28.]

[5]    While Gehl's Declaration filed in support of the Motion insinuates the same thing, the declaration is conclusory and hearsay insofar as it pertains to the terms of the transaction.

employment with Xtraction, Gehl never requested that Xtraction make a loan payment to him in connection with the Note. [Gleason Decl. ¶ 30.]

**D.      Gehl Also Inexplicably Pushes for Xtraction to Amend Its Bylaws Around the Time of the RIP Transaction**

Although the bylaws drawn up by Gehl's lawyers followed the "standards" Gehl always used, in or around November 2020 Gehl required that Xtraction implement a Second Amended and Restated Bylaws (the "Second Amended Bylaws"), which were also prepared by Gehl's lawyers. [Gleason Decl. ¶ 31 & Ex. 10.]

Unlike the prior, standard iterations, the Second Amended Bylaws provided for a mandatory buy-out of any shareholder who ceased acting as a director for Xtraction. In addition, Gehl required that Dunlop join him, Gleason, and Gurnee as Xtraction's Board Members. [*See id*.] Little did Gleason know that this revision to Xtraction's bylaws was in furtherance of Gehl's plan to extricate Gleason from enjoying the benefits of Xtraction's increasing opportunities and growth.

**E.      Gehl Demands that Gleason Sign a Guaranty and Pledge Agreement for the Note More than One Month after the Note Was Made**

At the end of December 2020/beginning of January 2021, Gehl demanded that Gleason sign a Personal Guaranty and Pledge Agreement in connection with the Note. [*See* Mot. at 9; Gleason Decl. ¶ 24.] Each document, an exhibit to Gehl's Complaint, is dated January 11, 2021, six weeks after the date of the Note (December 1, 2020). [Complaint, ECF 1, at Exs. B, C; *see* Scharringhausen Decl., Ex. 2, at 116:21 – 118:4.]

Gehl insisted that Gleason sign these documents as a "condition" of making the loan. [Scharringhausen Decl., Ex. 2 at 107:3-112:15; 113:1-116:13.] Gehl also demanded

that Gleason pledge his shares in Xtraction; Gehl did not inquire about any of Gleason's other assets as possible security—all Gehl wanted was the shares to be pledged. *Ibid.*

**F.**    **Gehl and Gurnee's Surreptitious Plans to Expand Xtraction's Processes to the East Coast behind Gleason's Back**

Over the next seven months, Gleason continued to devote time and efforts to managing and growing Xtraction, including the East Coast expansion. Unfortunately, during this time, Gehl and Gurnee were making clandestine plans to establish competing businesses to Xtraction and expand operations using Xtraction's processes without Gleason's inclusion or involvement.

For example, Gehl's production in the California action includes emails between him and Gurnee with the Subject: line, "List for North East," dated January 19 and 21, 2021—a little more than a week after the dates of the Personal Guaranty and Pledge Agreement. Although the emails pertained to Xtraction's expansions to the East Coast, the type of email on which Gleason had routinely been included (as the emails above demonstrate), Gleason was not included in the email exchange. [Gleason Decl. ¶¶ 35, 36 & Ex. 11; *see* Scharringhausen Decl., ¶ 5.] This was not an accident.

On a late Friday afternoon, March 5, 2021, Gurnee emailed Gleason (copying Gehl and Dunlop) regarding "Upcoming Debts." Gehl responded that day and, separately, emailed Dunlop. [Gleason Decl. ¶ 37 & Ex. 12; Scharringhausen Decl., ¶ 5.] Gleason responded on Sunday, March 7, 2021, explaining, among other things, that, "[u]ntil Xtraction business expands at least ***beyond the borders of California***," additional management would not be necessary. Further, "I do not see the need for additional

management.  *As our planned growth is almost exclusively MRC*, and Mike has an excellent relationship there, I'm not sure who we need to hire to do marketing."  [Gleason Decl. ¶ 38 & Ex. 13 (emphasis added); Scharringhausen Decl., ¶ 5.]

On March 16, 2021, Gehl confirmed that he and Gurnee were expanding Xtraction's processes to the East Coast without Gleason.  Specifically, in responding to my March 7, 2021, email (above), Gehl emailed Gurnee only, stating as follows:

> Mike, I reviewed Jim's [March 7, 2024] email and **it does sound like he anticipates to be involved in any growth**. **We need to be careful with what is said and not said to him**. Just reviewing some emails from him. Larry **PS THIS JUST WAS SENT TO YOU**

[*See* Ex. 13 (bold text added, capital text original).]  At no time did Gehl, Gurnee, Dunlop, or Young advise Gleason or even intimate that he would not be included as part of Xtraction's ongoing plans and expansion of its processes outside California, as had been the plan, discussed, and implemented during by employment with Xtraction.  [Gleason Decl.  ¶ 40.]  Quite clearly, Gehl had other plans.

## G.    Gehl Effectuates His Strategy to Oust Gleason

On July 7, 2021, without warning or cause, Gleason was summarily terminated for no cause at a meeting of the Board of Directors held with Gehl, Gurnee, and Dunlop.  Gehl brought the motion to terminate Gleason.  [Scharringhausen Decl., Ex. 2 at 176:17-177:18.]  In addition, Gleason was removed from Xtraction's Board of Directors.  [Gleason Decl. ¶ 41.]   As a result, Gleason was deprived of his ownership interest in Xtraction as his shares were taken from him.  [Scharringhausen Decl., Ex. 2 at 107:25-108:14 (Gehl

testifying that Gleason had ceased being a shareholder in 2021 following his termination); *see also* Gleason Decl., ¶ 41 & Ex. 17 [Xtraction 2021 tax return confirming same.]

In addition, Gleason has not been repaid for loans that he made to Xtraction or reimbursed for business expenses. Further, by their conduct, Gehl and Gurnee necessarily limited Xtraction's profitability, having steered business away from Xtraction, which continues to this day. [Gleason Decl. ¶ 42.]

## H. **Gleason Later Discovers the Extent of Gehl's Maneuverings**

After Gleason's dismissal from Xtraction, he discovered that Gehl and Gurnee (with the aid of Gehl's counsel) had been maneuvering for some time prior to the guaranty and dismissal to capitalize on Xtraction's processes through other ventures. In addition to the March 16, 2021 Gehl-Gurnee email discussed above, on March 20, 2021—less than one week after Gehl cautioned Gurnee to keep quiet about Gleason not being part of their ongoing business ventures—they formed GG Transport, LLC. [Gleason Decl. ¶ 42 & Ex. 14.]

Further, on August 2, 2021, less than 4 weeks after Gleason's termination, Gehl, Gurnee, and Young (the owner of RIP) formed an entity called GGY Transport, LLC (GGY = Gehl, Gurnee, & Young), a recycling services business operating under the DBA "Tough Stuff Recycling, LLC" (referred to herein as "GGY") in Minnesota. [Gleason Decl. ¶¶ 43, 44 & Ex. 15.] A few months later, the business registered to conduct business in Rhode Island. [Gleason Decl. ¶ 45 & Ex. 16.] GGY uses the same mechanical mattress shredding and recycling methodologies and technologies as those implemented with Xtraction. Indeed, the two companies were functionally identical, as GGY's website attested to. [*Id.*;

*see also* Scharringhausen Decl., Ex. 2 at 28:18-29:4 (Gehl testifying that Xtraction and Tough Stuff basically do the same things).]

## I.     Gehl's Selective Enforcement of the Guaranty

According to Gehl, he is owed upwards of $6 million dollars in loans to Xtraction. [Scharringhausen Decl., Ex. 2 at 21:18-21.] Also, according to Gehl, he only "demanded" that Xtraction pay on the Note to remind Gurnee that a lot of money due is still "outstanding." [*Id.* at 142:5-144:15.] Gehl has not entered into any kind of forbearance agreement, tolling agreement, or other modification of the "loan" that Gehl occasionally claims is in default. [*Id.* at 138:25-140:8; 140:22-141:18.]

However, Gleason is the only creditor that Gehl is pursuing, having not sued Xtraction or Gurnee. [*Id.* at 138:15-139:3.] And while Gehl claims that Xtraction does not have the funds to pay him, Xtraction was operating on a profit prior to Gleason's dismissal, and financial records Gleason has reviewed appear to show significant fees and outlays that could, and arguably should be used for loan payments. [Gleason Decl. ¶ 48.]

## J.     Gehl Dominates Xtraction, which is Nothing More than His Alter Ego

Following Gleason's unseemly ouster, Gehl increased his ownership interest in Xtraction to 60%. [Scharringhausen Decl., Ex. 2, at 124:5-125:6.] He has the power to choose Xtraction's officers. *Ibid*. He has the power to direct Xtraction's actions, *e.g.*, to hire and fire, to repay its debts, and to decide the direction of the business. [*Id.* at 107:3-112:15; 126:3-6; 133:24-134:18; 138:25-140:8; 147:21-148:17.] Gehl continues injecting money into Xtraction, but he does not know exactly how those monetary injections are being formally documented. [*Id.* at 162:5-15.] In fact, Gehl considers Xtraction to be an

extension of himself, which is why he is not suing Xtraction on the Note. [*Id.* at 168:22-25 (in asking why Gehl is not suing Xtraction for any of the past due loans, he answered, "Why am I going to sue a company that's mine?").]

## ARGUMENT

Summary judgment is appropriate only where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Neff v. World Pub. Co.*, 349 F.2d 235, 239 (8th Cir. 1965). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

In determining whether summary judgment is proper, a court may consider only admissible evidence. *Neff, supra,* 349 F.2d at 253-254 (citations omitted). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal

knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).").

Here, the Motion seeks a judgment on Count I in Gehl's Complaint for Breach of Contract with respect to the Personal Guaranty. As explained below, the Motion fails to provide admissible evidence or supporting authority or argument to warrant summary judgment against. The Court must then deny the Motion and consider Gehl's claims and Gleason's defenses at trial.[6]

## I. THE CONDITIONS NECESSARY TO ENFORCE THE NOTE ARE NOT PRESENT, PRECLUDING ENFORCEMENT OF THE GUARANTY

A guaranty is "a collateral contract to answer for the payment of a debt or the performance of a duty in case of the default of another who is primarily liable to pay or perform the same." *Geneva JPM 2003-PM1, LLC v. Geneva FSCX I, LLC*, 843 N.W.2d 263, 266 (Minn. Ct. App. 2014), quoting *Charmoll Fashions, Inc. v. Otto*, 248 N.W.2d 717, 719 (Minn. Ct. App. 976). Accordingly, before Gehl can enforce the Guaranty, the conditions to trigger enforcement of the Note must first have been triggered.

---

[6] The Motion also asks for a ruling that Gleason breached the Pledge Agreement. For the same reasons discussed below, Gehl is not entitled to summary judgment. In addition, the Pledge Agreement is not at issue in Count I, the subject of the Motion. Rather, it is the subject of Count III for Replevin, which is not a subject of the Motion. [Mot. at p. 2, footnote 1; *see also* Gleason's Complaint, ECF 1.] Further, as noted above, according to Gehl, Gleason is no longer a shareholder of Xtraction. [Scharringhausen Decl., Ex. 2 at 16:19-17-17:1; 107:3-112:15; 124:6-125:6.] This is consistent with Xtraction's tax returns since 2021, which do not show Gleason as a shareholder. [*See* Gleason Decl., Ex. 17, at Section H.] Gleason anticipates that Gehl is looking for a judgment he can attempt to enforce in the California action. Gleason's rights as a shareholder of a California corporation is best resolved in the pending California Action.

Under Minnesota law, in order to enforce the Note, the Motion must provide evidence that irrefutably establishes that each of the elements for breach of contract of the Note exist here: (1) formation of a valid contract; (2) performance of conditions precedent by the plaintiff; and (3) breach of the contract by the defendant. *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). A valid contract contains the elements of "offer, acceptance, and bargained for consideration." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 850 (8th Cir. 2014). Here, the Motion fails to provide admissible evidence and irrefutable facts to support the existence of each of these elements to support summary judgment.

*First*, the Motion fails to properly authenticate the Note at issue, relying solely on the declaration of Gehl's counsel, Charles Maier. [Mot. at p. 3 ("On December 1, 2020, Xtraction executed and delivered to Gehl a promissory note (the "Note") in the original principal amount of $2,120,200,00. [Maier Decl., Ex. 3.].) Counsel's declaration, however, fails to demonstrate personal knowledge to authenticate the Note.[7] [*Id.*, ¶ 5 (noting only that the Complaint "was attached as an exhibit to the Complaint in this matter").] Gehl's Declaration refers only generally to a promissory note; it also does not authenticate the Note. (*See* Gehl Decl., ¶ 3.) Further, Gleason's Answer does not admit the fact the Motion must prove, i.e., that Xtraction entered into the Note that is the subject of the Motion. (*See* Gleason's Answer at ¶ 7.)

---

[7] The same is true with respect to the Guaranty and the Pledge Agreement.

*Second,* the Motion fails to provide evidence to show performance or, separately, any consideration received by Xtraction in connection with the Note. Consideration is a fundamental requirement of contract formation. A promise that is not supported at the time it is made by consideration from the other party is not enforceable. *See, e.g., Chalmers v. Kanawyer*, 544 N.W.2d 795, 798 (Minn. Ct. App. 1996), *quoting Franklin v. Carpenter*, 309 Minn. 419, 422 (Minn. 1976). Failure of consideration occurs when a contract valid when formed becomes unenforceable because the performance bargained for has not been rendered. *See, e.g., Franklin, supra*, 309 Minn. at 422. Here, the Motion is devoid of evidence to indisputably establish that Gehl ever made a loan to Xtraction, let alone in connection with the Note. The Motion merely says so in passing without evidentiary support. [*See* Mot. at pp. 2-3 ("Xtraction's Purchase of RIP Assets") and p. 5 ("Gehl Performs His Obligations").] Although Gehl claims he paid monies to acquire RIP (Gehl Decl., ¶¶ 5-7), and Dunlop contends monies were wired to RIP in connection with that transaction (Dunlop Decl., ¶¶ 5-9),[8] there is no evidence (much less that is admissible) that any monies were ever deposited to or paid by Xtraction, demonstrating any agreement or terms relating to that purported transaction (such as the supposed promissory note made by Gehl to RIP (Gehl ¶ 6), that Xtraction ever became the owner of RIP, etc. In summary, the Motion fails to establish that Xtraction received any consideration in connection with the Note.

---

[8] Dunlop's Declaration contends that the wires were made in connection with the Note. Dunlop, however, has no personal knowledge to testify regarding such matters, such that his statements are irrelevant, speculative, and inadmissible hearsay.

*Third*, the Motion fails to establish that Xtraction is in breach of the Note, assuming it even could be. To require payment under the terms of the Note, Gehl was obligated under the Note to deliver to Xtraction a written Notice to Begin Payment. [Complaint, ECF 1, ¶ 14 and Ex. A (Note) at p. 1, Terms of Repayment.] While the Motion self-servingly contends Gehl sent that Notice (echoing the Complaint's allegation) on July 15, 2022 [Mot. at p. 5 ("Xtraction Fails to Repay the Loan")], it fails to provide competent, admissible evidence that this Notice was ever sent by Gehl. As is the case with *all* the documents purportedly relating to Gehl's claims, they are exhibits to Gehl's counsel's declaration, wherein counsel merely states that the Notice "was produced by Gleason in the course of discovery." (*See* Maier Decl., ¶ 10 & Exhibit 8.) Counsel cannot authenticate the Notice, as he has failed to establish personal knowledge thereof. Further, there is nothing in the document or the exhibit to suggest the Notice was ever sent. Moreover, Gehl's declaration is silent on the Notice, which he did not even recall at this deposition. [Scharringhausen Decl., Ex. 2 at 135:6-136:5.] So too is Dunlop's Declaration, where Dunlop was a supposed recipient of the letter. Indeed, Xtraction appears to never have received the Notice, which was not included in Xtraction's document production in the California Action. [*Id.* at ¶ 3.] Absent evidence that the Notice was provided in accordance with the Note, Xtraction could not be in breach of the Note.

Relatedly, to enforce the Note for non-payment, Gehl was obligated under the Note to deliver to Xtraction written notice (i) of a default for non-payment [Complaint, ECF 1, ¶ 16 and Ex. A (Note) at p. 1, Default, subsection (a)], and (ii) that Gehl was accelerating the Note such that all amounts were due and owing because of the default [*Id.*, ¶ 17 and

Ex. A (Note) at p. 2, Acceleration]. The Motion contends Gehl sent both written notice of default and notice of acceleration (echoing the Complaint's allegation) on July 19, 2023 [Mot. at p. 5 ("Xtraction Fails to Repay the Loan")]; however, the sending and receipt of the two notices, like the Notice to Begin Payment, are not admissible for the very same reasons the foregoing Notice is inadmissible. Nor does Gleason's Answer concede these supposed "facts."[9]

In bringing his Motion, Gehl assumed the responsibility to come forward with properly admissible evidence, including providing the necessary foundation for documents submitted in the Motion's support. He has not, and any attempt to correct this deficit in a reply brief should be rejected by the Court.

## II. THE CONDITIONS NECESSARY TO ENFORCE THE GUARANTY ARE NOT PRESENT

Even assuming Gehl has cleared the first hurdle by establishing by admissible evidence that Xtraction has breached the Note, genuine issues of material fact exist that preclude Gehl from obtaining summary judgment in his attempt to enforce the Guaranty.

*First*, the Complaint and Motion concede that Gehl was required, but failed, to provide Gleason with notice of default and demand for payment. In his Complaint, Gehl judicially admits that he was obligated to deliver the previously discussed Notice of Default and Notice of Acceleration "to Defendant as required under the Loan Documents."[10]

---

[9] The Motion also is defective as the each of the notices discussed above were not sent to the correct address listed for service as provided in the Note's opening paragraph. This might explain why Xtraction never received or produced them.

[10] Statements contained in a party's pleadings are binding on that party, and are considered judicial admissions, unless the statements are withdrawn or amended. *See*

[Complaint, EFC 1, ¶¶ 16, 17.]  However, as noted above, there is no admissible evidence, much less proof, that Gehl ever sent any of the notices to Xtraction or Gleason—who was not even addressed on any of the notices.  Having judicially admitted this fact as a prerequisite for enforcing the Guaranty, the Motion must fail.[11]

*Second*, Gleason received no consideration in connection with the Guaranty, rendering it unenforceable.  "Consideration is something of value given in return for a performance or promise of performance." *Powell v. MVE Holdings, Inc.*, 626 N.W.2d 451, 463 (Minn. App. 2001) (quotation omitted), *review denied* (Minn. July 24, 2001).  A guaranty to pay a pre-existing debt must be supported by consideration beyond the original obligation.  *Baker v. Citizens State Bank of St. Louis Park*, 349 N.W.2d 552, 557 (Minn. 1984).  Here, the Motion acknowledges the Guaranty and the Pledge Agreement were signed on January 11, 2021—more than one month after Xtraction allegedly made the Note.  [Mot. at p. 3 (re Guaranty) and p, 4 (re Pledge Agreement); *see also id.* at p. 9 ["Q: Were you aware, in – the end of 2020 or beginning of 2021, that you were being asked to … sign a personal guaranty…"].  However, by that date, Xtraction's obligations to Gehl as purportedly evidenced by the Note (i.e., the RIP acquisition) was already transacted, closing December 1, 2020.  (*See* Gehl Decl. ¶ 5.)  Thus, by the time Gleason would have

---

*Knudsen v. U.S.*, 254 F.3d 747, 752 (8th Cir. 2001). "[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Ibid.*, quoting *Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997).

[11] Insofar as Gehl's reply will dispute this, then there is an issue of fact regarding the requirements under the Note and Guaranty.  Gehl should not be heard to judicially admit his obligations in a pleading while then conveniently discarding that obligation in attempting to obtain summary judgment.

signed his Guaranty, there was no consideration beyond any existing obligation, which could not support separate consideration for the Guaranty.[12]

Even if the Guaranty was supported by some other consideration not identified in the Motion, it remains the case that Gleason received no consideration to support Gehl's current efforts to enforce it. Gleason's decision to sign the Guaranty was solely contingent on his ongoing involvement with Xtraction, including the significant discussions and strategies devised and implemented by Gleason, Gehl, and Gurnee leading up to and after the Guaranty, regarding expanding Xtraction's processes to the East Coast. And Gleason had no reason to suspect that this would not be the case. In addition to the continuing discussions and efforts jointly administered by Gleason, Gehl, and Gurnee in the months leading up to the RIP acquisition and Guaranty six weeks later, Gehl only months earlier had expressed his confidence in Gleason when suggesting that they get rid of Gurnee. Gehl's reliance on Gleason was evident.

Gleason never would have guaranteed any loan obtained by Xtraction if he was on notice that his days were with Xtraction were numbered and that he would not enjoy the benefits associated with his supposed loan guaranty. [Gleason Decl. ¶ 49.] Yet, this was precisely what happened, as Gehl, with the aid of counsel, amended Xtraction's already "standard" (by Gehl's account) bylaws to have the authority to force a sale of a shareholder shares upon Gleason's termination from the Board; engaged in exclusive negotiations with

---

[12] Nor would Gleason have obtained anything of benefit from signing the Guaranty. He was already a shareholder, and thus whatever benefit the RIP acquisition might have provided Xtraction, he would already have been the beneficiary once that transaction was completed.

Young regarding the acquisition of RIP, which negotiations almost certainly would have involved the creation of another company sans Gleason (i.e., GGY Transport); and the continued behind-the-scenes planning of East Coast operations after January 11, 2021 while Gleason pressed forward for months to continue to develop Xtraction, only to be cast aside by Gehl and Gurnee less than six months after he signed his Guaranty.

There is no valid argument that Gleason could have received any consideration under these circumstances. Gehl intentionally deceived Gleason in order to connive him into signing a guaranty that Gehl could later hang over Gleason's head in trying to deprive Gleason of his rights as one of the initial stakeholders in Xtraction—precisely what is happening in this lawsuit. Such maneuvering does not support a finding of consideration, particularly on summary judgment.

## III. THE GUARANTY IS NOT ENFORCEABLE BECAUSE THE ENTIRE LOAN TRANSACTION IS ILLUSORY

A contract is illusory where a party "had it in his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promise." *Cooper v. Jensen*, 448 S.W.2d 308, 314 (Mo. App. 1969). "A promise is illusory when one party retains the unilateral right to amend the agreement and avoid its obligations." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014).

In *Super Wings Int'l, Ltd. v. J. Lloyd Int'l, Inc.*, 701 F.3d 870 (8th Cir. 2012)—a case concerning a dispute governed by Iowa law—the court recognized that a contract becomes unenforceable due to a failure of consideration when "the performance bargained for has not been rendered." *Id*. at p. 873. Failure of consideration is a complete defense if

the alleged failure is "total," meaning one party "has failed or refused to perform a substantial part of what the part agreed to do." *Id.*

Gehl claims without evidentiary support that he made a "loan" to Xtraction, but in fact it appears that no such loan was ever made. Nevertheless, Gehl allegedly had Xtraction enter a Note obligating Xtraction to pay Gehl $2.12 million at 8% interest. Gehl claims he "demanded" payment on the Note, but at his deposition he clarified that he was only reminding the officers of Xtraction that he was owed money. He also claims the "loan" is in default, but he concedes that Xtraction is "mine," so he is not suing Xtraction, nor the other guarantor on the "loan." He likewise dominates the decisions of Xtraction, meaning it is within his power to have the "loan" repaid rather than spending money on things like expansion or litigation. In short, this is an illusory, sham arrangement that should not be enforced.

## IV. QUESTIONS OF FACT REMAIN REGARDING WHETHER GEHL SHOULD BE ESTOPPED FROM ENFORCING THE GUARANTY

Equitable estoppel is a doctrine designed to prevent a party from taking unconscionable advantage of his own actions. To invoke the doctrine, a party must show that the other party made representations or inducements upon which the former reasonably relied that will cause it harm if estoppel is not applied. *Northern Petrochemical Co. v. U.S. Fire Insurance Co.*, 277 N.W.2d 408, 410 (Minn.1979). Whether the elements of equitable estoppel are present is a question of fact. *See O'Donnell v. Continental Casualty Co.*, 116 N.W.2d 680, 684 (Minn. 1962).

The doctrine of equitable estoppel may be asserted to bar a litigant from denying the truth of representations of fact previously made where the following requirements are met: (1) There must be a misrepresentation of a material fact; (2) The party to be estopped must be shown to have known that the representation was false; (3) The party to be estopped must have intended that the representation be acted upon; (4) The party asserting the estoppel must not have had knowledge of the true facts; and (5) The party asserting the estoppel must have relied upon the misrepresentation to his detriment. *Transamerica Ins. Grp. v. Paul*, 267 N.W.2d 180, 183 (Minn. 1978) (citations omitted); *Village of Wells v. Layne-Minnesota Co.*, 60 N.W.2d 621, 627 (1953); *see also Lunning v. Land O'Lakes*, 303 N.W.2d 452, 457 (Minn. 1980).

Here, for the same reasons discussed above demonstrating that the Guaranty lacked consideration, the Court should deny the Motion given the numerous factual issues surrounding the making of the Guaranty—which facts, viewed in a light more favorable to Gleason as the moving party, tend to show that Gleason was the victim of Gehl's improper conduct. Prior to and after Gleason signed the Guaranty, Gehl made numerous misrepresentations relating to Xtraction's East Coast strategies and Gleason's inclusion in those plans. Gleason had no reason to believe otherwise, particularly given Gehl's expressed confidence in Gleason where Gehl was prepared to oust Gurnee, leaving Gleason to run Xtraction's day-to-day operations. Gehl also sought to have Gleason act upon those misrepresentations, including by making the Guaranty, although Gehl's works were well underway to expand Xtraction's processes to the East Coast operations sans Gleason. Indeed, Gehl went so far as to continue to use Gleason for several months despite taking

specific steps to expand Xtraction's processes to the East Coast, and he, Gleason, and Gurnee had planned all along, to start competing businesses using the very same technologies created by Xtraction, thus assuring that Gleason would never enjoy the benefits of his efforts as, per Gehl's interpretation of the Second Amended Bylaws, Gleason's shares could be stripped away from him immediately upon termination from Xtraction's Board—which is precisely what happened. Finally, if Gehl is permitted to follow through with this scheme, Gleason will be on the hook for a loan he most certainly would never have guaranteed had he known the truth. No one would guarantee a loan under such circumstances.

An equitable estoppel defense is not unlike fraudulent inducement to prevent enforcement of an agreement. In *Klein v. First Edina Nat. Bank*, 196 N.W.2d 619, 622 (1972), the Minnesota Supreme Court affirmed longstanding Minnesota law that one party to a transaction would have a duty to disclose material facts to the other to preclude enforcement of a contract. First, "[o]ne who speaks must say enough to prevent his words from misleading the other party." *Ibid.*, citing *Newell v. Randall*, 19 N.W. 972 (Minn. 1884). Second, "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party." *Ibid.*, citing *Marsh v. Webber*, 13 Minn. 109, Gil. 99 (1868). And third, "[o]ne who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts." *Ibid.*, citing *Wells-Dickey Trust Co. v. Lien*, 204 N.W. 950 (Minn. 1925).

Here, each of these circumstances apply to prevent Gehl's attempted enforcement on the Guaranty through summary judgment. Underlying the Guaranty was Gleason's

continued involvement with Xtraction as it expanded its processes to the East Coast. Gehl made numerous representations to Gleason that this is precisely what they were going to do together, when this was not true. Further, Gehl also had special knowledge regarding the fact, to wit, that Gleason would not be part of those plans, as Gehl secretly devised and started other businesses behind Gleason's back, including with RIP's Young. Yet, Gehl withheld those facts from Gehl to solicit the Guaranty.

Moreover, and separately, Gehl owed a fiduciary obligation to Gleason under California law, which would govern Gleason's obligations to Gleason as an officer and director of Xtraction, a California corporation. *See Xum Speegle, Inc. v. Fields* (1963) 216 Cal.App.2d 546, 554, and *Hall v. Dekker* (1941) 45 Cal.App.2d 783, 787 (each holding that a corporate director or officer may not enter into a competing enterprise which cripples or injures the business of the corporation and, in turn, harms its shareholders); *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 306 (holding that intentional failure to disclose a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose). "It is without dispute that in California, corporate directors owe a fiduciary duty to the corporation and its shareholders and now as set out by statute, must serve "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders." *Berg & Berg Enters., LLC v. Boyle*, 178 Cal.App.4th 1020, 1037 (2009), citing to California Corporations Code § 309. This requires that corporate directors act with honesty, loyalty, and good faith. *Ibid.* (citations omitted). Directors must administer their duties for the common benefit of all shareholders, including

minority shareholders. *See Kennerson v. Burbank Amusement Co.*, 120 Cal.App.2d 157, 772 (1953).

For any of these reasons, the Court should conclude that the Motion has failed to establish that Gehl, as a matter of law determined on summary judgment, can enforce the Guaranty. Indeed, the law, equity, and common sense dictate otherwise.

**V.**     **THE COURT SHOULD DEFER RULING ON THIS MOTION FOR SUMMARY JUDGMENT (OR ISSUING JUDGMENT, IF GRANTED) UNTIL AFTER RESOLUTION OF THE CALIFORNIA ACTION**

Gleason sued Gehl in November of 2022 in the Superior Court of the State of California, County of Orange. [*See* EFC 20, etc.] He alleged that Gehl defrauded him into entering into an employment agreement with Xtraction and into signing the Second Amended Bylaws (requiring a shareholder to forfeit their shares in the event they ceased acting as director of the company) so that Gehl could profit off Gleason's labors while secretly intending to make it impossible for Gleason to realize the benefits of those same labors. That matter is set for trial on July 14, 2025.

*After* Gleason sued Gehl in California, Gehl initiated this action, wherein he seeks orders compelling Gleason to pay Gehl hundreds of thousands of dollars and to turn over his shares in Xtraction (which Gehl says Gleason already lost).

Given the overlap between these two matters and Gleason's preexisting claims that Gehl engaged in fraud when dealing with Gleason, the Court should defer ruling on this motion for summary judgment until after Gleason has had his day in court in his California Action. Should Plaintiff be granted judgment, the interests of justice call for its enforcement be stayed pending the final resolution of the California Action.

## CONCLUSION

For all the reasons stated above, Gleason respectfully asks that the Court deny Gehl's Motion for Summary Judgment.

Dated: <u>October 22, 2024</u>         **DeWitt LLP**

                                    */s/Dwight G. Rabuse*
                                    Dwight G. Rabuse (#209429)
                                    901 Marquette Avenue, Ste. 2100
                                    Minneapolis, MN  55402
                                    Telephone:  612.305.1400
                                    dwight@dewittllp.com

                                    **BUCHALTER, A PROFESSIONAL CORPORATION**

                                    Jack R. Scharringhausen (*pro hac vice*)
                                    (Calif. No. 205483)
                                    Gordon C. Stuart (*pro hac vice*)
                                    (Calif. No. 294321)
                                    1000 Wilshire Blvd., Ste. 1500
                                    Los Angeles, CA 90017
                                    jscharringhausen@buchalter.com
                                    gstuart@buchalter.com

                                    ***Attorneys for Defendant James P. Gleason***

4895-8973-2850, v. 1